IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| WASTE CONTROL SPECIALISTS LLC, | § § § | |
| Plaintiff, | § § | |
| V. | § § | |
| ENERGYSOLUTIONS, LLC, | § § | Civil Action No. 7:15-cv-00034 |
| Defendants. | § § § § § § § | |

## ENERGYSOLUTIONS LLC'S ANSWER AND COUNTERCLAIM

Defendant EnergySolutions, LLC ("EnergySolutions"), by its undersigned attorneys, hereby answers Plaintiff Waste Control Specialists LLC ("WCS")'s Original Petition for Declaratory Judgment (the "Petition"). Except as otherwise expressly alleged herein, EnergySolutions denies each and every allegation contained in the Petition, including without limitation any allegations contained in the preliminary statement, headings, or subheadings of the Petition.

## PRELIMINARY STATEMENT

EnergySolutions denies the allegations in the unnumbered paragraphs on pages 1-2 of the Petition.

## RESPONSE TO SPECIFIC ALLEGATIONS

EnergySolutions responds to the specific allegations of the Petition in like-numbered paragraphs as follows:

## I.
## DISCOVERY LEVEL

1.  EnergySolutions states that no response is required to paragraph 1 because this suit was properly removed to this Court pursuant to 28 U.S.C. § 1441, and therefore any discovery will be governed by the Federal Rules of Civil Procedure.

## II.
## PARTIES

2.  EnergySolutions admits that WCS is a Delaware entity, and further states that EnergySolutions is organized under the  laws of the State of Utah.

3.  EnergySolutions admits the allegations in paragraph 3.

4.  EnergySolutions denies the first sentence of paragraph 4 and further states that EnergySolutions, LLC is a limited liability company organized under the laws of the State of Utah.  EnergySolutions admits the second sentence of paragraph 4.

## III.
## JURISDICTION AND VENUE

5.  EnergySolutions states that no response is required to paragraph 5 because this suit was properly removed to this Court pursuant to 28  U.S.C. § 1441.  EnergySolutions further states that this Court has federal subject matter jurisdiction pursuant to 15 U.S.C. §§ 2, 15, and 26 and 28 U.S.C. §§ 1331 and 1337.

6.  EnergySolutions admits the allegations in paragraph 6.

7.   EnergySolutions admits that all or a substantial part of the events or omissions giving rise to the claims occurred and/or will occur in Andrews County, Texas.

## IV.
## STATEMENT OF FACTS

8.   EnergySolutions lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8.

9.   EnergySolutions admits the allegations in paragraph 9.

**A.    EnergySolutions' efforts to enter into a contract with WCS.**

10. EnergySolutions denies the allegations in paragraph 10.

11. EnergySolutions denies the allegations in paragraph 11 except admits that EnergySolutions purchased Studsvik Processing Facility Erwin, LLC in March 2014, and admits that WCS, Studsvik Inc., Studsvik Processing Facility Erwin, LLC, and EnergySolutions are now engaged in an arbitration.

12. EnergySolutions denies the allegations in paragraph 12.

**B.    EnergySolutions' threats of litigation and other repercussions if WCS declines to do business with it.**

13. EnergySolutions denies the allegations in paragraph 13 except admits that it sent a letter to WCS on February 10, 2015 in which EnergySolutions advised WCS that EnergySolutions might seek injunctive relief against WCS if WCS refused to cease and desist its anticompetitive and monopolistic activity and bring its actions in accordance with the law.  A true copy of this letter is attached hereto as Exhibit 1.

14. EnergySolutions denies the allegations in paragraph 14.

15. EnergySolutions denies the allegations in paragraph 15 except admits that it sent a letter to WCS dated February 10, 2015.  In that letter, EnergySolutions stated that it has received several reports from customers that WCS has been attempting to undermine EnergySolutions in

the marketplace by telling customers about WCS's threats to not renew the disposal agreement between WCS and EnergySolutions. The letter further stated that "WCS's comments to prospective customers and any potential decision by WCS to terminate our longstanding and mutually profitable relationship appears to be nothing more than a blatant attempt to eliminate competition for the disposal of high activity resins." EnergySolutions further averred in the letter that "WCS's conduct, motivated by naked monopolistic intent, exposes WCS to the risk of a government investigation into WCS's compliance with federal and state antitrust and other regulations, including Texas Health & Safety Code Title 5, Subtitle D, Section 401.2456(d), or private action from EnergySolutions and others adversely affected by WCS's actions." EnergySolutions demanded that WCS "immediately cease its illegal attempt to undermine EnergySolutions and cease spreading rumors of WCS's anticompetitive intentions to EnergySolutions' customers," and warned that it would be "forced to seek injunctive relief against WCS" if WCS "refuses to bring its actions in accordance with the law[.]" EnergySolutions respectfully refers the Court to the February 10, 2015 letter for a complete and accurate statement of its contents.

16. EnergySolutions denies the allegations in paragraph 16 and respectfully refers the Court to the February 10, 2015 letter for a complete and accurate statement of its contents.

17. EnergySolutions denies the allegations in paragraph 17 and respectfully refers the Court to the February 10, 2015 letter for a complete and accurate statement of its contents.

18. EnergySolutions denies the allegations in paragraph 18.

## V.
## CLAIMS AND CAUSES OF ACTION

19. EnergySolutions states that each of the following responses is based on and incorporates the preceding responsive paragraphs as if fully set forth herein.

4

**COUNT ONE – DECLARATORY JUDGMENT**

20. EnergySolutions admits the allegations in paragraph 20.

21. EnergySolutions denies the allegations in paragraph 21 and further states that WCS is not entitled to the declaration requested because WCS's conduct and threatened conduct violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

22. EnergySolutions denies the allegations in paragraph 22.

**COUNT TWO – DECLARATORY JUDGMENT**

23. EnergySolutions admits the allegations in paragraph 23.

24. EnergySolutions denies the allegations in paragraph 24 and further states that WCS is not entitled to the declaration requested because WCS's conduct and threatened conduct violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

25. EnergySolutions denies the allegations in paragraph 25.

**VI.**
**PRAYER AND REQUESTED RELIEF**

EnergySolutions denies that WCS is entitled to any relief.

**AFFIRMATIVE AND OTHER DEFENSES**

Without undertaking any burden of proof not otherwise assigned to it by law, EnergySolutions asserts the following affirmative and other defenses with respect to the causes of action WCS purports to assert in the Petition:

**FIRST DEFENSE**

WCS is not entitled to the declaration requested in Count One of the Petition because WCS's conduct and threatened conduct violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

## SECOND DEFENSE

WCS is not entitled to the declaration requested in Count Two of the Petition because WCS's conduct and threatened conduct violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

## THIRD DEFENSE

EnergySolutions affirmatively raises and reserves all applicable equitable defenses.

## FOURTH DEFENSE

EnergySolutions presently has insufficient knowledge or information upon which to form a belief as to whether there may be, as yet unstated, affirmative defenses available, and therefore expressly (i) reserves the right to amend and/or supplement its Answer, defenses, and all other pleadings, (ii) reserves the right to (a) assert any and all additional defenses under any applicable federal and state law in the event that discovery indicates such defenses would be appropriate, and (b) assert any additional counterclaims when and if they become appropriate in this action.

## COUNTERCLAIM

Defendant EnergySolutions, LLC ("EnergySolutions"), by and through its undersigned counsel, files this Counterclaim against Waste Control Specialists LLC ("WCS"), and alleges on personal knowledge as to its own acts and on information and belief as to all other matters as follows:

## NATURE OF THE CASE

1.    This is an antitrust action against WCS, a monopolist in the disposal of Class B and C Low-Level Radioactive Waste ("LLRW").  WCS is a pure monopolist for a large and

well-defined group of LLRW disposal customers and is maintaining that monopoly position through anticompetitive conduct rather than competition on the merits. Through its anticompetitive actions, WCS seeks to thwart competition in the market for Class B and C waste disposal, which in turn harms customers that pay for the disposal of Class B and C waste.

2.    EnergySolutions does not allege that WCS acquired its monopoly power improperly. To the contrary, EnergySolutions acknowledges that WCS acquired its monopoly position lawfully.

3.    What EnergySolutions does challenge is WCS's maintenance of its monopoly position through anticompetitive conduct. Specifically, WCS has engaged in anticompetitive conduct targeted at eliminating "down-blending"—an NRC approved process by which high activity waste that would otherwise be classified as Class B and C waste can be blended with lower activity waste resulting in a homogenous Class A waste package, which is less expensive to dispose of. Some high activity waste, however, is too high in radioactivity to feasibly blend to meet the Class A waste classification and must therefore be disposed of as Class B or C waste. Because of the competitive threat that down-blending poses to WCS's monopoly, WCS has sought and seeking to stop down-blending altogether. But, to do so, it must (and has) wrongfully attempted to terminate an ongoing, profitable contract for the acceptance of processed Class B and C LLRW from EnergySolutions' predecessor company, Studsvik, Inc. ("Studsvik"). By eliminating this contract, WCS will prevent EnergySolutions from continuing its current down-blending, which serves as WCS's only competition in the market for disposal of Class B and C waste.

4.    WCS has known about down-blending since at least 2007. And, for years, WCS had engaged in a profitable business relationship with Studsvik, as a joint venture member and

subcontractor of Semprasafe, a joint venture formed in 2011 between EnergySolutions and Studsvik, to engage in down-blending. WCS knew that down-blending would drive down the price to consumers for disposal of Class B and C waste and that down-blending would cut into WCS's monopoly share, because Semprasafe was down-blending what would otherwise be 100% Class B and C waste disposed of by WCS.

5.   Despite years of a profitable business relationship with Studsvik during which WCS took no issue with disposal of Class B and C waste generated from Semprasafe's down-blending process, WCS opportunistically and improperly sought to terminate this course of dealing when EnergySolutions recently bought out Studsvik's interest in the Semprasafe venture. WCS is purporting to terminate its contract with Studsvik based on a change of control provision in its contract that required EnergySolutions to seek WCS's consent for certain transactions. But WCS also agreed that its consent "shall not be unreasonably withheld" which is patently the case here. Indeed, the real reason that WCS is withholding consent is to put an end to down-blending activities by Semprasafe (now known as Erwin ResinSolutions, LLC) and, in turn, to protect its monopoly over Class B and C waste disposal.

6.   With flagrant anticompetitive intent, WCS also has been telling EnergySolutions' customers that WCS intends to end its relationship with Erwin ResinSolutions, LLC and EnergySolutions. WCS deliberately encouraged those customers not to conduct business with EnergySolutions, knowing that EnergySolutions is a smaller rival that is able to compete in the purchase of Class B and C waste through down-blending. It is clear that WCS's intent in making these communications was to make it impossible for EnergySolutions to continue its down-blending activities, thereby protecting the fruits of its monopoly position in Class B and C waste disposal.

## JURISDICTION & VENUE

7.     This court has federal question jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337 for the reasons stated in EnergySolutions' Notice of Removal, and because WCS's Original Petition and this counterclaim seek relief under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to recover damages caused by, and to secure injunctive relief against, WCS for its past and continuing violations of Section 2 of the Sherman Act (15 U.S.C. § 2), as alleged herein.

8.     This Court has jurisdiction over the matters and transactions that are the subject of these Counterclaims pursuant to Federal Rule of Civil Procedure 13.

9.     Venue is proper in this judicial district under 28 U.S.C. § 1391.  WCS is headquartered in this district, and a substantial part of the events and injury giving rise to the claims set forth herein have occurred in this district.  Upon information and belief, WCS has engaged in anticompetitive behavior in this district, as alleged herein.

## THE PARTIES

10.     Counter-Claimant EnergySolutions, LLC, is a limited liability company organized under the laws of the State of Utah.  Its sole member is EnergySolutions, Inc., an entity incorporated under the laws of the State of Delaware with a principal place of business in Utah.

11.     EnergySolutions is an international nuclear services company headquartered in Salt Lake City, Utah with operations across the United States, Canada, the United Kingdom and other countries around the world.

12.    EnergySolutions operates a Class A waste disposal site in Clive, Utah. EnergySolutions cannot dispose of Class B and C waste at its Clive, Utah facility and must send such waste elsewhere for disposal.

13.    From 2011 until 2014, EnergySolutions participated in a joint venture called Semprasafe with Studsvik.  In 2014, EnergySolutions acquired Studsvik's interest in Semprasafe and also acquired Studsvik's subsidiary Studsvik Processing Facility Erwin, LLC, n/k/a Erwin ResinSolutions, LLC ("Erwin ResinSolutions").  Semprasafe (prior to the 2014 acquisition) and Erwin ResinSolutions (since the 2014 acquisition) down-blends radioactive LLRW so that some of the waste can be designated as lower-radioactive Class A waste, and then be disposed of at a Class A facility.  Waste that is not able to be blended to meet the Class A waste classification requirements must be disposed of as Class B or C waste at a Class B or C waste disposal facility.

14.    Upon information and belief, Counter-Defendant WCS is a Delaware LLC engaged in radioactive waste disposal for Class A, B and C waste.  According to the WCS website, WCS currently has extensive authorizations and permits allowing for receipt, treatment, storage and landfill disposal of hazardous/toxic waste and radioactive waste defined as "Exempt" under Title 25 of the Texas Administrative Code, Chapter 289.  WCS also has authorization for the receipt, treatment, and storage of low-level and mixed low-level waste.

15.    Aside from WCS, all other Class B and C LLRW disposal facilities are statutorily restrained from accepting Class B and C waste, and they can only accept such waste from a total of 14 states in accordance with a number of interstate compacts.  Thus, WCS is the only disposal facility available to all generators of Class B and C LLRW within the 36 states without such a compact.  This limitation also applies to Erwin ResinSolutions' down-blending facility in Tennessee, which is one of the 36 states that must dispose of all Class B and C waste with WCS.

10

**TRADE AND COMMERCE**

16.     The trade relevant to the Counterclaims is the disposal of Class A, B, and C waste throughout the United States, as described in more detail below.  WCS is attempting to eliminate competition in the relevant antitrust market for disposal of Class B and C waste, the dominance of which is threatened by the competitive option for customers to sell such waste to EnergySolutions (which now owns Erwin ResinSolutions), which is then down-blended into Class A waste.

17.     Through its anticompetitive scheme and conduct, including its attempt to terminate its contract with Studsvik, WCS has improperly maintained its monopoly power in the disposal of Class B and C radioactive waste generated in 36 states.

18.     WCS's anticompetitive actions already have caused injury to competition in these markets as well as to EnergySolutions' business and property, and unless enjoined, will continue to do so.

**FACTS RELEVANT TO ENERGYSOLUTIONS' COUNTERCLAIMS**

**I.      BACKGROUND OF CLASS A, B, AND C LLRW**

19.     Various businesses and industries generate radioactive waste, including nuclear power plants, fuel cycle entities such as Westinghouse and GE, medical institutions, and research facilities/universities.  Government entities such as the Department of Energy, the US Navy, and the Army Corps of Engineers also generate radioactive waste.

20.     The United States Nuclear Regulatory Commission ("NRC") regulates policies and procedures related to processing and disposal of radioactive waste.  The NRC has classified LLRW into three categories.  Class A consists of approximately 99% of all LLRW and can be

disposed of more easily and less expensively than higher-level radioactive waste.  The remaining 1% of LLRW consists of Class B and Class C waste, which are higher radioactivity waste and therefore subject to more rigorous disposal requirements.

21.     All classes of LLRW must be properly disposed of at a disposal facility that is licensed by either NRC or by states that enter into an agreement with the NRC pursuant to Section 274b of the Atomic Energy Act of 1954, whereby the NRC grants the state regulatory authority over the disposal of LLRW.

22.     LLRW disposal facilities must be designed, constructed, and operated to meet safety standards promulgated by the NRC.  The operator of the facility must also extensively characterize the site on which the facility is located and analyze how the facility will perform for thousands of years into the future.

23.     There are only four existing LLRW disposal facilities in the United States that accept various types of LLRW, all of which are in Agreement states: (1) the EnergySolutions facility in Barnwell, South Carolina, which accepts Class A, B, and C waste from the Atlantic compact states (Connecticut, New Jersey, and South Carolina); (2) the EnergySolutions facility in Clive, Utah, which accepts only Class A waste from almost all regions of the United States; (3) the WCS facility in Andrews, Texas, which accepts Class A, B, and C waste from almost all regions of the United States; and (4) the U.S. Ecology facility in Richland, Washington, which accepts waste only from the Northwest and Rocky Mountain compacts (Washington, Oregon, Idaho, Montana, Wyoming, Utah, Nevada, Colorado, Alaska, Hawaii, and New Mexico).

## II.    WCS IS A MONOPOLIST IN THE MARKET OF CLASS B AND C LLRW ORIGINATING FROM 36 STATES

24.    The Texas Compact Waste Facility is owned and licensed by the State of Texas. By agreement with the State of Texas, WCS operates the Texas Compact Waste Facility.  The facility has 9,000,000 cubic feet and 3,890,000 curies of disposal space.

25.    The WCS facility in western Andrews County, TX is the only commercial facility in the United States licensed to dispose of Class A, B, and C LLRW from any state.  Texas law does not limit WCS from only accepting LLRW from certain states, meaning it is the only company that can freely accept LLRW from generators in Texas and in 36 other states that do not have an operating compact facility.

## III.    DOWN-BLENDING HAS EXISTED FOR MANY YEARS AND IS WELL-KNOWN IN THE LLRW DISPOSAL INDUSTRY

26.    "Down-blending" is an NRC approved process by which high activity waste that would otherwise be classified as Class B and C waste can be blended with lower activity waste resulting in a homogenous Class A waste, which in turn makes it easier and less costly to dispose of that waste.

27.    Blending of LLRW, as a general matter, began in the industry at least as early as 1995, when the NRC issued guidance on the subject.

28.    Down-blending in particular is a well-known and accepted practice.  For example, in June 2008 the Barnwell, South Carolina disposal facility switched from accepting waste from all states to accepting waste from only South Carolina, Connecticut, and New Jersey, which form the Atlantic Interstate LLRW Management Compact.  This change left many LLRW generators in 36 states with no facility to dispose of Class B and C waste.  This situation precipitated the

expansion of down-blending and increased attention to the down-blending process from industry participants.

## IV.    ENERGYSOLUTIONS AND STUDSVIK BEGAN DOWN-BLENDING THROUGH SEMPRASAFE IN 2011

29.    In 2011, EnergySolutions and Studsvik entered into a joint venture called Semprasafe.  Semprasafe continued to engage in the down-blending of Class A, B, and C ion-exchange resins (waste) using Studsvik's THOR Process at its Erwin, Tennessee facility.  The THOR process uses heat to process and reform ion-exchange resins.  During this process, the resins remove radioactive isotopes from the water and then must be disposed of as radioactive waste.  Some of the resulting down-blended waste can meet the Class A waste classification requirements and can be disposed of at EnergySolutions' Clive, Utah facility.  The rest of the waste that is too high in radioactivity to feasibly blend to meet the Class A waste classification must therefore be disposed of as Class B or C waste at an approved facility.

30.    The THOR process decreases the amount of waste that would otherwise be classified as Class B and C waste.  LLRW is not classified until it is packaged for disposal, which occurs post-processing.  The waste that is processed using THOR has not yet been classified for disposal.  By using the THOR process, some of that waste can instead meet Class A criteria and therefore may be sent to EnergySolutions' Clive facility for less expensive disposal.

31.    The THOR down-blending process offers a competitive alternative for disposal of waste that would otherwise entirely be classified as Class B and C waste.

32.    By at least 2011, the industry in general and WCS in particular were aware that Semprasafe was engaging in down-blending, which posed a competitive threat to WCS.

## V.    WCS KNOWINGLY AND PROFITABLY ACCEPTED PROCESSED CLASS B AND C WASTE FROM STUDSVIK FOR YEARS

33.    With full understanding of down-blending and the competitive threat it posed, WCS entered into a 2012 Environmental Service Agreement for the Disposal of Low Level Radioactive Waste at the Texas Compact Waste Disposal Facility (the "2012 Agreement") with Studsvik.  The 2012 Agreement governed the disposal of Class B and C waste, including Class B and C waste that was the byproduct of down-blending through Semprasafe.  WCS entered into this 2012 Agreement under terms that were profitable for all parties and would continue to be profitable now.  In fact, some of the high activity waste that is processed using the THOR technology has a higher curie content than the original unprocessed waste resulting in Class B and C waste.  Due to the higher curie content, WCS was able to charge Semprasafe via the Studsvik contract a premium for the disposal of this waste.

34.    Critically, the 2012 Agreement with Studsvik includes an "evergreen" renewal provision and does not contain any provisions or covenants that prevent or limit Studsvik (or any successors) from continuing to engage in down-blending of Class B and C waste through the Semprasafe venture with EnergySolutions or otherwise.

35.    Beginning on and around December 2012, WCS knowingly began to accept Semprasafe's THOR-processed Class B and C waste pursuant to the 2012 Agreement.  WCS also knew that EnergySolutions was disposing the resulting Class A waste from the down-blending operations at its Clive, Utah facility.  WCS continued to accept processed waste from Semprasafe pursuant to the 2012 Agreement from 2012 through 2014.

## VI.  WCS IMPROPERLY REFUSED TO CONSENT TO THE ASSIGNMENT OF ITS PROFITABLE CONTRACT WITH STUDSVIK TO ENERGYSOLUTIONS

36.     On or about February 11, 2014, Studsvik informed WCS that it had entered into a purchase agreement by which EnergySolutions would buy out Studsvik's interests in Semprasafe as well as Studsvik's down-blending technology and facilities.  Studsvik requested that WCS consent to the assignment to EnergySolutions of Studsvik's contractual rights.  By the terms of the Agreement, WCS's consent "shall not be unreasonably withheld."  EnergySolutions' purchase of Studsvik included the contractual rights in the 2012 Agreement for the disposal of processed Class B and C LLRW.

37.     On February 26, 2014, WCS stated that it would withhold that consent pursuant to section 12 of the 2012 Agreement, which governs assignment of rights or delegation of performance.  WCS provided no reasonable justification for withholding its consent as required.  Nor did WCS purport to invoke any other termination provision from the 2012 Agreement.  Instead, WCS vaguely asserted that its decision was based on unidentified "business, legal, and policy considerations."

38.     WCS has since revealed its true motive, making clear that it wished to use EnergySolutions' purchase of Studsvik as an excuse to try to terminate an otherwise profitable agreement with Studsvik.  Although termination of the 2012 Agreement would be temporarily less profitable to WCS, in the long term it would effectively end all down-blending of Class B and C waste, which would solidify WCS's monopoly hold over Class B and C disposal.

## VII.  WCS THEN REFUSED TO ENTER INTO A COMPETITIVE NEW CONTRACT ON REASONABLE TERMS AND CONDITIONS WITH ENERGYSOLUTIONS

39.     In addition to WCS's wrongful termination of the Studsvik evergreen contract by refusing to assign it to Studsvik's purchaser, EnergySolutions, WCS evidenced its

anticompetitive intent by engaging in bad faith and discriminatory negotiations over a new contract with EnergySolutions. WCS offers other customers a rate of approximately $2,500/ft$^3$ for a similar volume of non-processed waste. WCS has been accepting THOR-processed waste under the pre-existing Studsvik Agreement for about $10,000/ft$^3$. Despite EnergySolutions and Studsvik being one of WCS's largest customers over the last three years from a revenue perspective, WCS has since demanded a baseless and exorbitant rate of over $12,000/ft$^3$, knowing that such rate could not lead to any economically reasonable agreement with EnergySolutions.

40.     Equally revealing of WCS's anticompetitive and coercive intent, WCS also sought to eliminate continued down-blending by EnergySolutions by insisting that WCS would not enter into a new contractual agreement with EnergySolutions or accept *any* waste from EnergySolutions unless EnergySolutions agreed not to engage in down-blending. Such an agreement would not only limit EnergySolutions' current practices, but it would also preclude even WCS from future innovation, further harming customers by reducing innovation and consumer-options while increasing price.

41.     WCS's "offers" to EnergySolutions were not made in good faith, but rather were part of WCS's overall monopoly scheme to put an end to down-blending—a market force it had helped to create and profited from.

## VIII.   WCS'S REFUSAL TO ACCEPT PROCESSED NUCLEAR WASTE *AT ALL* FORSAKES SHORT-TERM PROFITS TO DRIVE ENERGYSOLUTIONS FROM THE MARKET

42.     WCS's decision to (a) terminate its mutually beneficial and profitable relationship with Studsvik by refusing consent to the assignment of the 2012 Agreement to EnergySolutions and (b) refuse to enter into a new contract with EnergySolutions is contrary to WCS's manifest

17

economic incentives—apart from the continued competitive threat posed by EnergySolutions' down-blending operations. WCS accepts wastes from all competitors based on the radioactivity levels of the waste. WCS had been accepting THOR-processed Class B and C waste from the Studsvik joint venture at premium prices for years. And, absent its anticompetitive intent, WCS would continue to profit from the disposal of processed waste from EnergySolutions (as the assignee of the 2012 Agreement), but now refuses to do so entirely for anticompetitive reasons.

43.    Further, WCS has reported recent financial losses. WCS would achieve significant economic benefits from honoring its contractual obligations with Studsvik by accepting EnergySolutions' processed waste, particularly because such waste disposal generates greater revenue per cubic foot than other LLRW. As a waste disposal company, WCS is refusing waste volume by dramatically changing a pre-existing business practice that, if continued, could greatly add to its bottom line. WCS is doing so because it knows that, as a monopolist, it is the only source of disposal of Class B and C waste in the absence of EnergySolutions' down-blending. Thus, WCS knows that a short-term refusal to continue its profitable, contractual obligations with Studsvik by honoring that contract with the purchaser of Studsvik's interests, EnergySolutions, will eliminate down-blending and force this innovative competitor from the market. Simply put, WCS has chosen to forego these short-term benefits in order intentionally to reduce EnergySolutions' incentive and ability to down-blend, thereby protecting WCS's monopoly position.

**RELEVANT MARKET**

## I.    RELEVANT PRODUCT MARKET FOR CLASS B AND C LLRW DISPOSAL

44.    The relevant antirust market here is a market for the disposal of Class B and C LLRW.  Class B and C waste is a delineated form of LLRW according to the NRC and there are specific government regulations prohibiting unlicensed firms from receiving such waste.

45.    Facilities only licensed to accept Class A waste may not accept Class B or C LLRW and thus do not restrain price on the disposal of Class B and C waste.

## II.    RELEVANT GEOGRAPHIC MARKET

46.    The relevant geographic market is the group of 36 states from which generators of Class B and C LLRW can send their waste only to Texas due to interstate legal restrictions on LLRW disposal.

47.    A small but non-transitory increase in price for the disposal of waste generated in any of the 36 states would not cause these generators of LLRW to ship anywhere else due to national regulations.

48.    Therefore, there is no cross-elasticity of demand between the 36 states and other disposal facilities in other states.

49.    Therefore, a small but non-transitory increase in price for the disposal of waste generated in any of these 36 states would be profitable to the hypothetical monopolist.

### III.    BARRIERS TO ENTRY

50.    Regulatory barriers to entry limit competition in the markets for disposal of Class A, B, and C waste.  In North America, four commercial LLRW landfills have exclusive, regulated control over any LLRW generated within a permitted geographic region.

51.    It is extremely expensive and time-consuming to enter the LLRW disposal market.  It took WCS approximately eight years to complete the licensing process for its new LLRW landfill, which began accepting waste in April 2012.

52.    Additionally, in hazardous-waste management, customer switching costs are high, because ultimate environmental remediation liability may rest with the waste generator.  Existing customers are hesitant to switch to an unproven vendor and risk egregious financial penalties just to save a marginal amount.  Because very few options exist for hazardous-waste generators to reliably remain in compliance, consumers do not often switch between facilities.

### INJURY TO COMPETITION, CONSUMERS, AND ENERGYSOLUTIONS

53.    WCS's anticompetitive scheme designed to eliminate down-blending—including its unjustified change in its prior, profitable acceptance of THOR-processed Class B and C waste from Erwin ResinSolutions— harms competition and innovation for LLRW down-blending and disposal.  The anticompetitive conduct eliminates EnergySolutions' down-blending capabilities, which serve as WCS's only competition for LLRW generators in 36 states.  WCS's abrupt refusal to continue to accept processed Class B and C waste reduces the number of consumer options for the disposal of LLRW by eliminating the possibility of the use of an innovative technique to generate Class A waste from more costly Class B and C waste.

54.     The same monopolistic conduct that harms competition also harms the business and property of EnergySolutions.  WCS's anticompetitive conduct has the purpose and effect of causing EnergySolutions to terminate its profitable down-blending activities, which causes injury to EnergySolutions, in addition to the harm to customers who would have no competitive option for Class B and C waste disposal other than WCS.

## CAUSES OF ACTION

## COUNT I

## (SHERMAN ACT § 2 CLAIM FOR MONOPOLIZATION OF CLASS B AND C LLRW DISPOSAL MARKET IN 36 STATES)

55.     EnergySolutions repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 56 as if fully set forth herein.

56.     Section 2 of the Sherman Act (15 U.S.C. § 2) prohibits, *inter alia*, the willful monopolization of any part of the trade and commerce among the states.

57.     WCS has monopoly power in the Relevant Market for Class B and C LLRW disposal in the 36 states without disposal compacts and has maintained this power through anticompetitive behavior.

58.     WCS has engaged in anticompetitive conduct to improperly preserve and enhance its market power, including wrongfully terminating a profitable contractual course of action whereby WCS accepted processed LLRW, refusing to re-enter into a new contract for the disposal of such waste, and contacting customers of its only remaining competitor and informing them that, through WCS's anticompetitive actions, WCS will soon be their only option for Class B and C waste disposal.

59.    Each aspect of this behavior described above is anticompetitive conduct that itself violates the antitrust laws.   Further, each aspect of this behavior demonstrates WCS's anticompetitive intent.   In addition, each act has the purpose and effect of maintaining and enhancing WCS's monopoly power in this Relevant Market.

60.    If, for any reason, WCS is deemed not to have monopoly power in the Relevant Market, there is a dangerous probability that WCS will acquire such power.

61.    WCS's anticompetitive monopoly power has given it the power to control pricing and exclude competition from the Relevant Market.

62.    Upon information and belief, state and federal regulations impose high barriers to entry and expansion for any potential new entrant into the Relevant Market.   These barriers are evidenced by the fact that WCS itself boasts that it is the only commercial facility in the United States licensed to dispose of all Class A, B, and C LLRW in the past 40 years.

63.    WCS's willful and wrongful maintenance and/or extension of its monopoly power is not the result of growth and development as a result of innovation, business acumen, or by virtue of offering a superior product.   Rather, it is a direct consequence of WCS's intentional, exclusionary conduct in connection with its anticompetitive behavior.

64.    There is no efficiency-enhancing, procompetitive justification for WCS's behavior.

65.    WCS' anticompetitive behavior alleged herein has injured (and unless enjoined, will continue to injure) consumers and competitors in the Relevant Market for the disposal of Class B and C LLRW through reduced output, reduced choice, reduced innovation, and other anticompetitive effects.

66.    By reason of WCS's unlawful monopolization of the Relevant Market, EnergySolutions—a competitor in the acceptance of Class B and C LLRW for disposal which down-blends the waste and makes disposal cheaper for LLRW generators—has been injured in its business and property.

67.    Unless enjoined and declared illegal, WCS's unlawful conduct will continue, EnergySolutions will continue to sustain injury and damages, and competition will continue to be decreased in the Relevant Market.

68.    The injuries to EnergySolutions described herein are the types of injuries that the antitrust laws are designed to prevent because they are the direct result of WCS's illegal, anticompetitive scheme to exclude competitors from the market.

69.    WCS is entitled to injunctive relief and treble damages.

## REQUEST FOR RELIEF

**WHEREFORE**, EnergySolutions requests a judgment:

(1) Holding that WCS take nothing on its claims;

(2) Awarding EnergySolutions treble damages on its counterclaim in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and in an amount to be determined at trial;

(3) Entering an injunction against WCS in accordance with Section 16 of the Clayton Act, 15 U.S.C. § 26;

(4) Awarding EnergySolutions its costs and reasonable and necessary attorneys' fees; and

(5) Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

EnergySolutions demands a jury trial on all issues so triable.

23

Dated:  March 13, 2015                    Respectfully submitted,

                                          */s/ Noelle M. Reed*
                                          Noelle M. Reed, Attorney-in-Charge
                                          State Bar No. 24044211
                                          Western District of Texas Bar No. 24044211
                                          noelle.reed@skadden.com
                                          Heather A. Lohman
                                          State Bar No. 24027008
                                          Western District of Texas Bar No. 24027008
                                          heather.lohman@skadden.com
                                          SKADDEN, ARPS, SLATE,
                                          MEAGHER & FLOM LLP
                                          1000 Louisiana, Suite 6800
                                          Houston, Texas 77002
                                          Tel.: (713) 655-5100
                                          Fax:  (713) 655-5200

                                          James A. Keyte
                                          james.keyte@skadden.com
                                          *Admission pro hac vice pending*
                                          Marissa E. Troiano
                                          marissa.troiano@skadden.com
                                          *Admission pro hac vice pending*
                                          SKADDEN, ARPS, SLATE,
                                          MEAGHER & FLOM LLP
                                          4 Times Square
                                          New York, NY 10036
                                          Tel.: (212) 735-3000
                                          Fax: (212) 735-2000/1

                                          John A. Davis, Jr.
                                          State Bar No. 05511400
                                          Western District of Texas Bar No. 05511400
                                          jadavis@dgclaw.com
                                          Jill C. Pennington
                                          State Bar No. 24007825
                                          Western District of Texas Bar No. 24007825
                                          jcpennington@dgclaw.com
                                          DAVIS, GERALD & CREMER
                                          400 West Illinois, Suite 1400
                                          Midland, TX 79701
                                          Tel.: (432) 687-0011
                                          Fax: (432) 687-1735

                                          *Attorneys for Defendant EnergySolutions, LLC*

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2015, a true and correct copy of the foregoing document has been electronically filed with the Clerk of the Court, and has been served via certified mail, return receipt requested, on the following counsel of record.

Van H. Beckwith
John B. Lawrence
Melissa A. Hurter
BAKER BOTTS L.L.P.
2001 Ross Avenue, Suite 600
Dallas, Texas 75201


John L. Pool
THE LAW OFFICE OF JOHN L. POOL, PC
117 NW Ave. A.
Andrews, Texas 79714


*Attorneys for Plaintiff Waste Control Specialists LLC*


_/s/ Noelle M. Reed_____
Noelle M. Reed