IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| WASTE CONTROL SPECIALISTS LLC | § § § | |
| Plaintiff and Counter-Defendant | § § § | Civil Action No. 7:15-cv-00034 |
| v. | § § § | |
| ENERGY SOLUTIONS, LLC | § § § | |
| Defendant and Counter-Plaintiff | § § | |

## WASTE CONTROL SPECIALISTS' MOTION TO DISMISS COUNTERCLAIM

Van H. Beckwith
Texas State Bar No. 02020150
John B. Lawrence *(admitted pro hac vice)*
Texas State Bar No. 24055825
Melissa A. Hurter *(admitted pro hac vice)*
Texas State Bar No. 24087776
Baker Botts L.L.P
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 – facsimile
Van.Beckwith@bakerbotts.com
John.Lawrence@bakerbotts.com
Melissa.Hurter@bakerbotts.com

John L. Pool
Texas State Bar No. 24006284
117 NW Avenue A
Andrews, Texas 79714
(432) 523-4145
(432) 523-4496 – facsimile
john@thepoolfirm.com

*Attorneys for Plaintiff and Cross-Defendant*
*Waste Control Specialists LLC*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF UNCONTESTED FACTUAL ALLEGATIONS ................................. 3

ARGUMENT ................................................................................................................. 7

    I.  ES FAILS TO PLEAD A VIABLE MONOPOLIZATION CLAIM AS A MATTER OF LAW ................................................................................................. 7

        A.    WCS has the right to refuse to deal with whomever it chooses .............. 8

        B.    There is no antitrust "duty to deal" on terms demanded by competitors ................................................................................................11

    II. THE COUNTERCLAIM DOES NOT CONTAIN FACTUAL ALLEGATIONS OF ANTITRUST INJURY ...................................................................................... 15

        A.    ES alleges no harm to competition in the relevant market ................... 16

        B.    ES likewise fails to sufficiently plead injury to even itself .................... 18

CONCLUSION ........................................................................................................... 19

# TABLE OF AUTHORITIES

### CASES

*Aladdin Oil Co. v. Texaco Inc.*,
    603 F.2d 1107 (5th Cir. 1979) ...........................................................................9

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ..........................................................................., 13, 14,

*Associated Press v. United States*,
    326 U.S. 1 (1945).............................................................................................8

*Ashcroft v. Iqbal*,
    556 U.S. 663 (2009) ...................................................................................18, 19

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ...................................................................................16, 18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................18, 19

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ......................................................................................16

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986) ......................................................................................18

*Goldwasser v. Ameritech Corp*,
    222 F.3d 390 (7th Cir. 2000) .......................................................................10

*In re Canadian Imp. Antitrust Litig.*,
    470 F.3d 785 (8th Cir. 2006) .......................................................................13

*Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*,
    924 F.2d 539 (4th Cir. 1991) .......................................................................12

*Live Universe, Inc. v. MySpace, Inc.*,
    304 Fed. Appx. 554 (9th Cir. 2008)..............................................................15

*Mid–Tex. Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*,
    615 F.2d 1372 (5th Cir. 1980) .......................................................................9

*Morris Communications Corp. v. PGA Tour, Inc.*,
    364 F. 3d 1288 (11th Cir. 2004).....................................................................8

*Norris v. Hearst Trust*,
500 F.3d 454 (5th Cir. 2007) ...................................................................4, 18

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
797 F.2d 370 (7th Cir. 1986) ...................................................................10, 11,

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
555 U.S. 438 (2009) ...................................................................8, 10, 11, 12

*Schor v. Abbott Laboratories*,
457 F.3d 608 (7th Cir. 2006) ...................................................................10

*United States v. Colgate & Co.*,
250 U.S. 300 (1919) ...................................................................8, 9, 13

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) ...................................................................7

*United States v. Microsoft*,
253 F.3d 34 (D.C. Cir. 2001) ...................................................................8, 16

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ...................................................................9, 11, 12, 13, 14, 15

**OTHER AUTHORITIES**

30 Tex. Admin. Code § 336.229 ...................................................................2, 3, 5, 12, 18

Fed. R. Civ. P. 12(b)(6) ...................................................................1, 4

Texas Health and Safety Code, Chapter 401, § 401.106 ...................................................................5

Counter-Defendant Waste Control Specialists LLC ("WCS") submits this Motion to Dismiss EnergySolutions, LLC's ("ES") Counterclaim for failure to state a monopolization claim under Federal Rule of Civil Procedure 12(b)(6).

## INTRODUCTION

This is a highly-unusual antitrust case, to put it mildly.  ES wants this Court to force its competitor, WCS, to not only cooperate with ES, but lend ES a helping hand by disposing of the "byproduct"[1] of ES's proprietary down-blending process that ES developed to compete with WCS.  It asks this Court to order WCS to do so despite WCS's clear right under the antitrust laws to do business with whomever it chooses.  And despite the fact that the State of Texas—which not only governs *but actually owns* the facility where ES wants this waste disposed—has banned the practice that results in this byproduct waste.  ES wants all of this not to help customers—it does not allege that any generator of low-level radioactive waste ("LLRW") is unable to dispose of waste with WCS—but solely to help ES.  It seeks to force WCS into a contract so that it can receive the benefits of WCS's hard work and investment in a state-of-the-art disposal facility without having to incur those costs itself.  This is not the purpose of the federal antitrust laws.  ES's request is nothing more than a negotiating ploy masquerading as an overblown federal antitrust case.

First, the antitrust laws impose no duty upon WCS to deal with every would-be customer or supplier.  Companies are free to do business or not do business with

---

[1] The Counterclaim does not specifically define this "byproduct," but WCS understands it to be the alleged Class B and C waste byproduct that is "volume-reduced" using ES's THOR process, and for the purposes of this motion accepts those allegations and that description as true.  *See* Counterclaim ¶ 33.

a particular customer or supplier as they see fit. This is true even if the Court accepts the Counterclaim's boilerplate assertion that WCS is somehow a "monopolist."[2]

Second, the antitrust laws are designed to encourage competition between rivals—and to discourage them from cooperating with each other. It is highly unusual and legally defective for ES on the one hand to allege that it competes with WCS for the disposal of LLRW, Counterclaim ¶¶ 3, 6, 10-13, and on the other hand to petition this Court to force WCS to cooperate with ES. The Counterclaim does not allege that WCS ever contracted with ES to dispose of LLRW, and the antitrust laws do not require WCS to start. *Id.* ¶¶ 33-41. There is simply no requirement for WCS to "lend a helping hand" to its rival. Particularly where ES is demanding that WCS dispose of "higher-curie" Class B and C LLRW that is a "byproduct" of a down-blending process that the State of Texas—which owns the facility where ES wants its waste disposed, *id.* ¶ 24,—has forbidden.[3]

Third, the Counterclaim fails because it does not sufficiently allege any "antitrust injury." Every antitrust claim must allege facts suggesting both (a) that the defendant's conduct injured the *competitive process*, and (b) that the *plaintiff suffered an injury that flows from* that disruption. The Counterclaim does neither.

---

[2] WCS vehemently denies that it is a monopolist or has the "power to control prices" in any market.

[3] 30 Tex. Admin. Code § 336.229 ("Prohibition of Dilution. No person shall reduce the concentration of radioactive constituents by dilution to meet exemption levels established under the Texas Health and Safety Code, Chapter 401, § 401.106, or change the waste's classification or disposal requirements."). Though the statute does not specifically address disposal of waste that results from such dilution, WCS understandably refuses to accept for disposal in Texas waste that results from a process that the State of Texas has decreed to be illegal.

It alleges that WCS is authorized to—and does—dispose of Class A, B, and C LLRW from all of the nuclear power plants, medical and research institutions, and other companies and government entities that generate LLRW in 36 states. Counterclaim ¶¶ 23-24. But it does not allege that WCS has refused to dispose of any Class A, B, or C LLRW from any of those LLRW generators. Instead, it alleges only that WCS will not dispose of the "byproduct," higher-curie Class B and C LLRW that results when one company, ES, takes A, B, and C LLRW from the generators and "down-blends" some of it into Class A LLRW. *Id.* ¶ 13.

The alleged refusal to start dealing with ES thus does not harm the *competitive process*: generators of Class A, B, and C LLRW can still dispose of their waste at WCS, which is precisely the end result ES seeks to compel. Moreover, ES's alleged injury (ES's inability to dispose of the higher-curie Class B and C LLRW "byproduct" from its own down-blending process) does not "flow" from an antitrust wrong—it flows from a decision by the State of Texas to ban down-blending, from the decisions of other states to forbid disposal of such waste at ES's disposal sites, and from ES's own business decisions to not pursue on not invest the time, money, and effort to obtain licenses to dispose of its byproduct B and C LLRW.

### STATEMENT OF UNCONTESTED FACTUAL ALLEGATIONS

**The Generation of A, B, and C LLRW**. LLRW is generated by various private and government entities, including nuclear power plants, fuel cycle entities, medical institutions, research facilities, and the Department of Energy. *Id.* ¶ 19. Permanent disposal of that LLRW is governed by the U.S. Nuclear Regulatory Commission ("NRC") and state laws. *Id.* ¶¶ 20-21.

The NRC classifies LLRW into three classes: A, B, and C. *Id*. ¶ 20. Class A has the lowest radioactivity content and comprises 99% of all LLRW generated in the United States. *Id*. Class B and C LLRW have increasing radioactive content, but together account for only 1% of all LLRW in the United States. *Id*.

**The Parties and the Disposal of LLRW.** ES is an international nuclear services company headquartered in Utah and with operations across the United States, Canada, the United Kingdom, and other countries around the world.[4] *Id*. ¶ 11. ES operates two of the four commercial LLRW disposal facilities in the United States. *Id*. ¶¶ 12, 23. Its Clive, Utah facility is authorized to accept Class A waste from "almost all regions of the United States." *Id*. In 1999, ES applied for a license to also dispose of Class B and C LLRW at this facility, but voluntarily withdrew that application in 2005 after regulators approved the license, but before receiving approval from the Utah legislature.[5]

ES's facility in Barnwell, South Carolina used to accept Class A, B, and C waste from all states, but as a result of licensing changes in South Carolina now only accepts this waste from the three Atlantic Compact states. *Id*. ¶¶ 23, 28.

---

[4] ES describes itself as the "global leader" in processing and disposing of nuclear waste. For the 2013 calendar year, ES had revenues of $1.8 billion (*See* 2013 Annual Report of EnergySolutions, Inc., at http://www.sec.gov/Archives/edgar/data/1393744/000139374414000008/es-20131231x10k.htm) compared with $39.2 million for WCS (*See* 2013 Annual Report of Valhi, Inc., at http://www.valhi.net/phoenix.zhtml?c=103380&p=irol-reports). When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court may take judicial notice of materials in the public record. *See Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record").

[5] *See* Joe Bauman, *Senate Oks Class B, C waste ban*, Deseret News, (Feb. 3, 2005), http://www.deseretnews.com/article/600109256/Senate-OKs-Class-B-C-waste-ban.html?pg=all.

A third facility, in Richland, Washington, is operated by a competitor named U.S. Ecology and accepts Class A, B, and C LLRW from the eleven states in the Northwest and Rocky Mountain Compacts.  Counterclaim ¶23.

And the fourth is the WCS-operated facility in Andrews, Texas, which the State of Texas actually owns.  *Id.* ¶¶ 23-24.  The Texas facility can accept Class A, B, and C LLRW from generators in Texas and in 35 other states that do not have their own operating compact disposal facility.  *Id.* ¶¶ 23, 25.

**The Semprasafe Joint Venture and "Down-Blending."**  In 2011, ES and Studsvik formed the Semprasafe joint venture, which engages in "down-blending" of LLRW at a facility in Erwin, Tennessee that uses ES's THOR technology.  *Id.* ¶¶ 15, 29.  ES allegedly uses this down-blending process to blend LLRW that would otherwise be classified as Class B or C waste (and thus cannot be disposed of at ES's own facilities) with lower radioactivity waste to produce Class A waste that ES can dispose of.  *Id.* ¶¶ 13, 29.  "The rest of the waste" is "too high in radioactivity" to meet the Class A waste classification and "must therefore be disposed of as Class B or C waste at an approved facility."  *Id.* ¶ 29.[6]

The Counterclaim alleges that down-blending is "an NRC approved process," *id.* ¶ 3, but does not contain any factual allegations (or cite any regulations)

---

[6] Only 1% of total LLRW is Class B or C waste, and only a portion of that 1% can go through the down-blending process.  Non-nuclear power waste is incapable of being down-blended.  *See* Studsvik Letter to NRC, January 29, 2010 at http://pbadupws.nrc.gov/docs/ML1003/ML100341258.pdf.

supporting that assertion.   Official government records demonstrate that it has been declared illegal by the State of Texas[7] and restricted in Utah.[8]

**WCS's Contract with Studsvik, Not ES.**   WCS entered into a 2012 Environmental Service Agreement with then-customer Studsvik for the disposal of LLRW.  *Id.* ¶ 33; Pet. ¶ 11.  When ES acquired Studsvik's operations in February 2014, Studsvik attempted to assign its rights under the agreement to ES without WCS's prior written consent, which terminated the agreement.  *Id.* ¶¶ 5, 36-37.[9]

The Complaint does not allege that WCS has ever entered into a contract with ES to dispose of LLRW.  Nor does it allege that WCS ever had a contract with ES for the disposal of down-blended LLRW (or any so-called "higher curie content" Class B and C waste resulting as a "byproduct" of its "THOR technology.").[10] *Id.* ¶¶ 3, 5, 33.   Indeed, the Counterclaim does not allege that WCS had any contractual relationship or any "prior course of dealing" directly with ES whatsoever.  *Id.* ¶¶ 33, 36, 39.

In 2014, after the termination of the Studsvik agreement, WCS entered negotiations for an agreement to dispose of LLRW from ES, but the parties did not

---

[7] 30 Tex. Admin. Code § 336.229 (Prohibition of Dilution).

[8] *See* UTAH DEP'T OF ENVT'L. QUALITY, DIV. OF RADIATION CONTROL, RADIATION CONTROL BOARD POSITION STATEMENT ON DOWN-BLENDING RADIOACTIVE WASTE (2010), http://www.deq.utah.gov/boards/radiationcontrol/docs/positions/position_downblending.pdf ("The Board is opposed to waste blending when the intent is to alter the waste classification for the purposes of disposal site access.")

[9] The parties are required to arbitrate all disputes under that agreement.  In April 2014, WCS initiated arbitration against Studsvik for its breach of that agreement by improperly seeking to assign its rights to ES.

[10] The "THOR-process" decreases the volume of the waste, but does not decrease the radioactivity (e.g., "curie content") of the waste.  Counterclaim ¶ 33.

reach an agreement. *Id.* ¶ 39. ES now alleges that WCS engaged in "bad faith and discriminatory negotiations over a new contract with EnergySolutions," demanded a "baseless and exorbitant rate of $12,000/ft³ [versus the $10,000/ft³ it alleges was reasonable]," and refused to "accept *any* waste from ES unless ES agreed not to engage in down-blending." *Id.* ¶¶ 39-40. ES alleges that WCS's actions were a "scheme to put an end to down-blending" which "serves as WCS's only competition in the market for disposal of Class B and C waste." *Id.* ¶¶ 3, 41.

The Counterclaim contains no allegation that any LLRW generator has been refused WCS's services for disposal of Class B or C LLRW, or that WCS's prices for disposal have increased.

**ARGUMENT**

## I.   ES FAILS TO PLEAD A VIABLE MONOPOLIZATION CLAIM AS A MATTER OF LAW.

A Section 2 violation requires proof of two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

ES "does not allege that WCS acquired its monopoly power improperly. To the contrary, EnergySolutions [alleges] that WCS acquired its monopoly position lawfully." Counterclaim at ¶ 2. Instead, the Counterclaim alleges only that WCS unlawfully *maintained* its lawful monopoly—by refusing to enter into a contract with ES to start disposing of *ES's* higher-than-normal radioactivity B and C waste

7

that is the byproduct of *ES's* down-blending process.  *Id.* ¶¶ 39-40.  ES
acknowledges that it is able to and does dispose of the down-blended Class A waste
it purposefully creates through its down-blending process. *Id.* ¶ 29.  ES's claimed
injury is, then, as a *supplier* of the byproduct Class B and C waste.[11]

An unlawful maintenance claim requires an allegation that the alleged
monopolist engaged in conduct that had the effect of "preventing or excluding
competition" by excluding *a competitor* from the relevant product market.
*Morris Commc'ns Corp.  v.  PGA Tour,  Inc.,* 364 F.3d 1288,  1294  (11th Cir.  2004)
(citing *United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001)).  Those
allegations are missing here.

### A.   WCS has the right to refuse to deal with whomever it chooses.

"As a general rule, businesses are free to choose the parties with whom they
will deal, as well as the prices, terms, and conditions of that dealing," and unilateral
refusals to deal are perfectly legal under the antitrust laws.  *Pac. Bell Tel. Co. v.
Linkline Commc'ns, Inc.*, 555 U.S. 438, 448, 457 (2009).  It is fundamental that an
"owner of [] property can choose his associates and can . . . decide for himself
whether and to whom to sell or not to sell."  *Associated Press v. United States*, 326
U.S. 1, 14-15 (1945).  A firm thus has "the unquestioned right to stop dealing with"
anyone it chooses "for reasons sufficient to himself."  *United States v. Colgate & Co.*,
250 U.S. 300, 307 (1919).

The  Fifth  Circuit  has  repeatedly  followed  this  guidance  in  holding  that

---

[11] *See infra* Section II (ES's failure to plead factual allegations of antitrust injury).

businesses unquestionably have the right to deal, or refuse to deal, with whomever they choose, and a unilateral refusal to deal is not unlawful as a matter of law. *See Mid–Tex. Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*, 615 F.2d 1372, 1388 (5th Cir. 1980) (reversing judgment in favor of plaintiff, holding that "[a]s a general rule, a company has the right to deal with whomever it chooses"); *Aladdin Oil Co. v. Texaco Inc.*, 603 F.2d 1107, 1113-15 (5th Cir. 1979) (affirming summary judgment in favor of defendant where an oil company assigned an option to purchase distributorship to a competing distributor, and defendant refused to sell to the competing distributor, holding that a "seller has a unilateral right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself").

The Supreme Court reaffirmed this long-standing rule in a decision upholding dismissal of a monopolization complaint at the pleading stage. *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). In *Trinko* the Supreme Court held that companies may deal or refuse to deal with whomever they choose, and do not have any duty under Section 2 to cooperate with their competitors:

> Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law.... [C]ompelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion. Thus, as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'

*Id.* at 407-08 (quoting *Colgate*, 250 U.S. at 307). WCS has an advantage, which the Counterclaim acknowledges it obtained lawfully after years of hard work and

investment.  The facility it operates in Andrews County can lawfully accept Class B and C waste from 36 states.  ES cannot accept any Class B and C waste at its Clive, Utah facility, but its Barnwell, South Carolina facility can accept Class B and C waste from South Carolina, New Jersey, and Connecticut.  Counterclaim ¶ 23.

ES essentially wants this Court to force WCS to hand over to ES the benefit of its years of hard work and substantial investment, something ES chose not to create on its own.  But no law requires WCS to do so.  Even an alleged monopolist has "no antitrust duty to deal with its rivals at all." *Linkline*, 555 U.S. at 449; *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375-76 (7th Cir. 1986) (reversing judgment in favor of plaintiff, the court held that even an alleged monopolist has "no duty to extend a helping hand" to competitors).  When it comes to competitors, "[c]ooperation is a *problem* in antitrust, not one of its obligations." *Schor v. Abbott Labs*, 457 F.3d 608, 610 (7th Cir. 2006) (affirming dismissal of monopolization claim, holding that "antitrust law does not require monopolists to cooperate with rivals by selling them products that would help the rivals to compete"); *Goldwasser v. Ameritech Corp*, 222 F.3d 390, 398 (7th Cir. 2000) (affirming dismissal, holding that alleged "monopolists normally do not need affirmatively to help their competitors").  ES's claim here that WCS refused to enter into a "new contract" is a perfect example of "precisely the kinds of affirmative duties to help one's competitors that . . . do not exist under the unadorned antitrust laws." *Id.* at 400.

Notably, ES alleges that WCS accepts "Class B and C radioactive waste

generated in 36 states," but does not allege that WCS has refused to accept waste from any *customer* in any of the 36 states.  Counterclaim ¶ 17.  ES likewise does not allege any prior course of dealing for the disposal of LLRW with WCS *by ES itself* at all.  *Id.* ¶¶ 33-41.  Instead, ES merely alleges that WCS refused to enter into an entirely new contract to accept a very small amount (<1% of all LLRW) of higher-radioactivity Class B and C waste with "higher curie content" than normal Class B and C waste because that waste is the "byproduct" of ES's down-blending.  *Id.*

WCS has no antitrust duty to assist ES in its efforts to dispose of its higher curie content down-blending "byproduct."  Even an alleged "lawful monopolist" has no duty to assist its competitors, and WCS has no duty to assist ES by acceding to its demands that WCS "*must* negotiate towards and agree to a contract" here.  Pet. ¶ 14; *see Trinko*, 540 U.S. at 408-09; *Olympia Equip.*, 797 F.2d at 375-76.  Thus, ES's Counterclaim simply does not plead a valid claim under the antitrust laws.

### B.   There is no antitrust "duty to deal" on terms demanded by competitors.

In the alternative, ES alleges that WCS unreasonably withheld access to the Andrews County, Texas facility by allegedly demanding "a baseless and exorbitant rate of $12,000/ft³ [versus $10,000/ft³ it alleges was reasonable], knowing that such rate could not lead to any economically reasonable agreement" and refusing to enter a contract "unless EnergySolutions agreed to not engage in down-blending." Counterclaim at ¶¶ 39-40.  But the Supreme Court made clear in *Trinko* and *Linkline* "that a defendant with no antitrust duty to deal with its rivals [certainly] has no duty to deal under the terms and conditions preferred by those rivals."

*Linkline*, 555 U.S. at 457 (citing *Trinko*, 540 U.S. at 409-10); *id.* at 450 ("a firm has no antitrust duty to deal with its competitors," and "certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous"); *see also Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 545 (4th Cir. 1991) ("the reasonable standard of the access factor cannot be read to mean the assurance of a profit for LSG").

ES's allegations reveal nothing more than a complaint about a tough negotiation that ended without the deal ES wanted. ES believes it is entitled to force WCS to contract with it on terms ES demands, but WCS has no duty under the antitrust laws to deal with ES at all, and certainly not on terms demanded by ES. *Linkline*, 555 U.S. at 450; *Trinko*, 540 U.S. at 410.

Moreover, the related allegation that WCS asked ES to discontinue its down-blending activities as a condition of any contract was simply a demand that prior to entering a contract, ES discontinue a practice that the State of Texas has deemed illegal. WCS's Andrews County, Texas commercial waste disposal facility is *owned by the State of Texas*,[12] and the State of Texas clearly prohibits the act of down-blending. *See* 30 Tex. Admin. Code § 336.229.[13] It is perfectly legitimate to set as a condition to entering into a contract that ES discontinue a practice that the State of

---

[12] Counterclaim ¶ 24; *see* Radioactive Material License R04100, Amendment Number 25 at LC 141, http://www.wcstexas.com/pdfs/licenses/Amendments/Amendment%2025.pdf.

[13] *See* 30 Tex. Admin. Code § 336.229; *see also* Attachment C to Radioactive Material License R04100 for the WCS facility that states "Treatment and processing for the purposes of dilution or changing waste classification are prohibited in accordance with 30 TAC §336.229.", *available at* http://texreg.sos.state.tx.us/public/readtac$ext.TacPage?sl=R&app=9&p_dir=&p_rloc=&p_tloc=&p_ploc=&pg=1&p_tac=&ti=30&pt=1&ch=336&rl=229.

Texas has deemed illegal.

A firm has "the unquestioned right to stop dealing with" anyone it chooses and may do so because it believes a company is doing something improper or "trying to undermine his trade." *Colgate*, 250 U.S. at 307. If there is no duty to deal with a competitor in general under the antitrust laws, WCS certainly has no duty to enter a contract for the disposal of LLRW with a company that it believes is "undermining [its] trade" by violating Texas law. *Id.*; *see also In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (affirming dismissal, holding that the conduct at issue "is prohibited by federal law," and the "absence of competition . . . is [therefore] caused by the federal statutory and regulatory scheme adopted by the United States government, not by the conduct of the defendants").

The only potential limitation to the fundamental right of companies to refuse to deal with whomever they choose is very narrow, if it still exists at all, and arose in a case far different than this one. In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), the defendant owner of three of four mountains in the Aspen area had cooperated *directly* with the plaintiff, which owned the fourth mountain, in issuing joint all-area ski passes—and had done so "for years." *Aspen Skiing*, 472 U.S. at 593-94; *Trinko*, 540 U.S. at 408. After years of such cooperation, the defendant unilaterally terminated the ongoing agreement to issue joint tickets and refused to even permit the plaintiff to buy the defendant's tickets at retail prices. *Id.* The Supreme Court upheld a jury verdict for the plaintiff, reasoning that the jury could reasonably conclude that the defendant "elected to forgo these

13

short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor." *Id.* at 608.

The Supreme Court in *Trinko* acknowledged widespread criticism of *Aspen Skiing* and noted its view that the decision was "at or near the outer boundary of § 2 liability." 540 U.S. at 399. The Court thus declined to follow or extend it and held that the courts should be "cautious" in recognizing exceptions to the right of businesses to refuse to do business with every would-be customers or competitors "because of the uncertain virtue of forced sharing." *Id.* at 408-09. The *Trinko* Court held that the right to refuse to deal with anyone could only be limited if there was a "unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing" and an unwillingness by defendant to continue the same prior course of conduct "*even if compensated at retail price.*" *Id.* at 409. This was central to the Court's decision because the profitable "prior course of dealing" *directly* with its competitor that was terminated suggested a willingness to forsake short-term profits to achieve an anticompetitive end. *Id.* By contrast, in *Trinko*, there was no allegation that "Verizon voluntarily engaged in a course of dealing with its rivals," and the Court affirmed dismissal on those grounds. *Id.*

The facts alleged here are far different than *Aspen Skiing* and much like *Trinko*. Here, ES does not allege that WCS ever previously and voluntarily engaged in a direct course of dealing *with ES*, period, through contract or otherwise, for the disposal of LLRW. Counterclaim ¶¶ 33-36. This alone dooms its claim.

WCS's prior contract with Studsvik, a former customer, does not provide ES

with a basis to claim a prior course of dealing, even if the prior contract somehow unintentionally enabled ES's business model.  The Ninth Circuit in *Live Universe, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008), dealt with precisely this distinction and likewise held that a prior course of dealing between an alleged monopolist and its *customers* is not equivalent to cooperation with a rival.  *Id.* (affirming dismissal of complaint, the court held that "[t]hough this may indicate a prior course of dealing *between MySpace and its users*, nothing in the complaint suggests an agreement, or even an implicit understanding, *between MySpace and LiveUniverse*").  The distinction is crucial—antitrust laws very clearly require a "termination of a voluntary" prior course of dealing with the competitor itself to fall within any potential limitation.  *Trinko*, 540 U.S. at 409.

ES's refusal to deal claim centers around WCS's alleged refusal to enter an entirely "*new contract with EnergySolutions*," Counterclaim ¶39 (emphasis added), on new terms that would extend beyond the term of the Studsvik agreement. Simply put, ES is using this Counterclaim in an attempt to force WCS to enter into an entirely new agreement on new terms with a new counterparty, which WCS has consistently made clear it does not want.  ES's claim should be dismissed.

## II. THE COUNTERCLAIM DOES NOT CONTAIN FACTUAL ALLEGATIONS OF ANTITRUST INJURY.

The Counterclaim does not contain the necessary factual allegations of antitrust standing to maintain ES's claim.  As shown below, ES relies on conclusory boilerplate assertions void of the necessary factual allegations to maintain an antitrust violation.

### A.    ES alleges no harm to competition in the relevant market.

ES's Counterclaim fails to allege injury to competition. A plaintiff does not state a claim simply because it alleges an injury casually linked "to an illegal presence in the market." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "Instead, a plaintiff must prove the existence of 'antitrust injury, which is to say injury *of the type the antitrust laws were intended to prevent* and *that flows from that which makes defendants' acts unlawful.*'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (emphasis added) (citations omitted). To allege antitrust injury based on WCS's alleged exclusionary conduct, the conduct "must harm the competitive process and thereby harm consumers . . . . [H]arm to one or more competitors will not suffice" for a section 2 violation. *United States v. Microsoft Corp.,* 253 F.3d 34, 70–71 (D.C. Cir. 2001). That element is entirely missing here.

The Counterclaim defines the relevant market as the "market for the disposal of Class B and C LLRW" in "the group of 36 states from which generators of Class B and C LLRW can send their waste only to Texas." Counterclaim ¶¶ 44-46. To survive a motion to dismiss, ES thus must plead injury to competition in that market. But the Counterclaim does not allege that ES competes in that market at all. On the contrary, the Counterclaim acknowledges that ES is not a competitor in the disposal of Class B and C waste from those 36 states. At best, the Counterclaim alleges that ES is a "supplier" of down-blended Class B and C waste to WCS, or in the alternative, a potential "customer" seeking to dispose of down-blended waste from one state, Tennessee. But WCS has no obligation to do business with any

given supplier, and even if ES is a potential customer, it is not a customer in the same class as the other customers.  ES is the only customer that down-blends Class B and C waste with Class A waste, and in the process creates a down-blended waste "byproduct."  ES has not sufficiently alleged that it is a ***competitor*** that was excluded in the relevant market, and its claim thus fails as a matter of law.

ES's Counterclaim is likewise vague and conclusory as to why ES cannot continue to dispose of its Class A LLRW as it does now, and simply store its "byproduct" Class B and C LLRW at its facility in Tennessee or elsewhere.  ES alleges only the ***conclusion*** that it will be forced to stop the down-blending process altogether if WCS does not dispose of ES's "byproduct" Class B and C LLRW, but it alleges no facts to support that conclusion.  ES also does not allege any refusal by WCS to accept Class B or Class C waste from any nuclear plant, medical or research facility, government agency, or any other LLRW generator in the alleged 36-state relevant market.

In an attempt to overcome these deficiencies, ES relies entirely on antitrust buzzwords like "caused injury to competition," "harms competition and innovation," and "reduces the number of consumer options."  *See, e.g.*, Counterclaim ¶¶ 18, 53.  But these buzzwords cannot provide the factual support for antitrust injury.  The Counterclaim does not allege any *facts* regarding how or when any customer is harmed, other than boilerplate and speculative legal conclusions.

ES is required to make allegations that are "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action. . . ."  *Bell*

17

*Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 663, 678 (2009) ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"); *Norris v. Hearst Trust*, 500 F.3d 454, 464-66 (5th Cir. 2007) (affirming dismissal of antitrust complaint pursuant to *Twombly* for failing to make factual allegations regarding antitrust injury as "[p]laintiffs are neither consumers...nor competitors...in the relevant market.  Plaintiffs have not suffered antitrust injury.").  Without factual allegations of injury to consumers, the Counterclaim must be dismissed.

**B.    ES also fails to sufficiently plead injury to itself.**

To plead antitrust standing, ES must also allege facts showing that it suffered an actual injury that "flows from" the alleged antitrust violation.  *Cargill, Inc. v. Monfort of Colo. Inc.*, 479 U.S. 104, 111 (1986). ES's alleged inability to dispose of the "higher curie content" Class B and C "byproduct" of the down-blending process it performs at its Tennessee facility does not "flow" from the alleged actions of WCS.  *See Atl. Richfield Co.*, 495 U.S. at 334.  Instead ES's alleged injuries flow from: (1) Texas's prohibition of the down-blending process;[14] (2) the decisions of the other state governments to not give ES regulatory approval to accept the down-blended "byproduct" LLRW at the Clive, Utah[15] or Barnwell, South Carolina facilities;[16] and (3) ES's decision not to invest necessary resources to obtain the requisite licenses to dispose of Class B and C LLRW, including its decision in

---

[14] 30 Tex. Admin. Code § 336.229 (Prohibition of Dilution).

[15] *See supra* note 8.

[16] Counterclaim ¶ 23.

2005 to voluntarily withdraw its license application in Utah for the disposal of Class B and C LLRW.[17]

As these alleged injuries do not flow from the alleged actions of WCS, ES's assertion that it must terminate its down-blending activities must be rejected. As the Counterclaim asserts, Class A waste represents 99% of all generated LLRW in the United States, and ES can and will dispose of the Class A waste that its down-blending generates at its Clive, Utah facility. Counterclaim ¶¶ 20, 29. ES's boilerplate speculative assertion that it will forego down-blending in its entirety fails to meet the pleading standards under *Twombly*. *See Iqbal,* 556 U.S. at 678 (allegations "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation") (*citing Twombly*, 550 U.S. at 555). ES failed to sufficiently plead direct injury to retain antitrust standing, and as a result the Court should dismiss its Counterclaim.

## CONCLUSION

For the reasons discussed herein, WCS respectfully requests that the Court dismiss ES's Counterclaim.

---

[17] *See supra* note 5.

Respectfully submitted,

s/ *Van H. Beckwith*
Van H. Beckwith
Texas State Bar No. 02020150
John B. Lawrence *(pro hac vice)*
Texas Bar No. 24055825
Melissa A. Hurter *(pro hac vice)*
Texas State Bar No. 24087776
BAKER BOTTS L.L.P.
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 - facsimile
van.beckwith@bakerbotts.com
john.lawrence@bakerbotts.com
melissa.hurter@bakerbotts.com

John L. Pool
Texas State Bar No. 24006284
117 NW Avenue A
Andrews, Texas 79714
(432) 523-4145
(432) 523-4496 - facsimile
john@thepoolfirm.com

*Attorneys for Plaintiff and Counter-Defendant Waste Control Specialists LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 13, 2015 I served the foregoing document on all parties and counsel of record pursuant to Local Rule CV-5 through filing that document via the Court's CM/ECF system.

<u>s/ <i>Van H. Beckwith</i>      </u>
Van H. Beckwith

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| WASTE CONTROL SPECIALISTS LLC | § | |
| | § | |
| | § | |
| Plaintiff and | § | |
| Counter-Defendant | § | Civil Action No. 7:15-cv-00034 |
| | § | |
| v. | § | |
| | § | |
| ENERGY SOLUTIONS, LLC | § | |
| | § | |
| Defendant and | § | |
| Counter-Plaintiff | § | |

**[PROPOSED] ORDER GRANTING WASTE CONTROL SPECIALISTS'
MOTION TO DISMISS**

On this day came before the Court Waste Control Specialists LLC's Motion to

Dismiss.  The Court ORDERS that this motion is GRANTED.


SIGNED AND ENTERED this ____ day of _____, 2015.


_____
Harry Lee Hudspeth
Senior United States District Judge